The **PEOPLE** of the State of Colorado, Complainant,

v.

**Paul T. WRIGHT, Respondent.**

No. 83SA500.

Supreme Court of Colorado, En Banc.

Feb. 19, 1985.

Linda Donnelly, Disciplinary Prosecutor, Denver, for complainant.

Paul T. Wright, Denver, pro se.

ROVIRA, Justice.

A formal complaint was filed with the Supreme Court Grievance Committee, charging the respondent, Paul T. Wright, admitted to practice law in Colorado on May 7, 1971, with unprofessional conduct in violation of the Code of Professional Responsibility.

The complaint alleged that the respondent: (1) misused and misappropriated trust funds entrusted to him by his client, Charles J. Charles, in violation of DR 5–101(A); (2) commingled his client's funds with his own in violation of DR 9–102(A)(2); and (3) failed to maintain complete records or render appropriate accounts to his client contrary to DR 9–102(B)(3). The complaint also alleged that the respondent's conduct adversely reflects on his fitness to practice law, DR 1–102(A)(6); involves dishonesty, fraud, and deceit, DR 1–102(A)(4); and constitutes grounds for discipline pursuant to DR 1–102(A)(1) and C.R.C.P. 241.6.

The respondent denied the allegations of misconduct. He admitted that his client had executed a trust agreement on February 8, 1977, in which respondent had been named as trustee, and that in 1977 he had received funds on behalf of Charles.

After a hearing at which the respondent appeared and testified, the Hearing Board made findings of fact. The evidence established the relationship and course of conduct between the respondent and his client and meets the standard of clear and convincing evidence necessary to warrant a finding of misconduct. C.R.C.P. 241.14(d).

In early 1977, respondent began his representation of Charles, who had a history of physical and mental illness, and was a widower and the father of two daughters.

Charles owned some property on South Ivy Street in Denver, Colorado, which was the subject of a suit for specific performance. The respondent settled the suit and, at the same time, in furtherance of Charles's desire to provide for his minor daughters, prepared a revocable inter-vivos trust agreement with Charles as settlor and respondent as trustee. The trust agreement was executed on February 8, 1977.

The trust provided that the income and principal were to be paid to Charles during his lifetime as he directed, or as might be necessary for his support and maintenance. On Charles's death, the trust assets were to be held in trust for his children. The assets of the trust consisted of the South Ivy Street property, which was deeded to respondent by Charles on the same day he executed the trust agreement.

Respondent subsequently conveyed the property to the plaintiff in the specific performance lawsuit and received $17,312. The funds were either placed in the respondent's general firm account or in an account owned and maintained by Tennessee Mineral Ventures (TMV).

TMV was a limited partnership or joint venture formed to develop coal property in Arkansas. Respondent represented TMV or some of its Colorado investors and was himself an investor. Respondent testified that he was not able to recall whether the funds he received in trust for Charles were used by TMV to pay for bulldozers, or to buy certificates of deposit which were put up as collateral for a reclamation bond required by the State of Arkansas. Respondent recalled only that he had sent $25,000, including the $17,312 in trust funds, to Arkansas for one or the other of the foregoing purposes.

According to the respondent, Charles was aware of his interest and involvement in TMV and directed the respondent to invest the trust funds in that enterprise. No written documentation evidencing such authority was produced by the respondent.

Charles also owned property on York Street in Denver. In May of 1977, Charles deeded this property to respondent as trustee. Later, respondent sold the property for $1,683.81 in cash and an installment note payable to Paul T. Wright, Trustee, in

the principal amount of $31,000 with interest at 8½ percent per annum. The note was secured by a deed of trust on the York Street property and was payable over a term of 25 years in monthly installments of $249.63, which included principal and interest.

Respondent testified that he was not sure whether any of the proceeds from the York Street sale went to TMV or not. He admitted that neither the cash payment nor any of the note payments were put into a trust account or any identifiable trust investments.

In 1978 TMV terminated operations. All funds invested by the respondent on his own account, or for the account of his clients, including the funds from the Charles trust, were lost.

During this period of time, Charles was also involved in some limited partnership real estate ventures with George N. Smith. Smith periodically made calls on Charles for additional partnership assessments. At some time after the trust funds had been invested in TMV, Charles asked the respondent to pay the periodic assessments required by Smith from the trust income or assets. Although the respondent claimed that Charles had previously directed him to invest the trust proceeds in TMV, he nevertheless undertook to see that the assessments were paid to Smith. .

In the fall of 1982, Charles requested the Grievance Committee to investigate the respondent's administration of the trust. Shortly thereafter, the respondent resigned as trustee and, on September 1, 1982, assigned to Charles the note and deed of trust which he had received as Trustee on the sale of the York Street property. At about the same time, respondent prepared and delivered to Charles a single handwritten page captioned "Partial Accounting to Charles J. Charles 6/1/77 through 9/1/82."

In his testimony before the Hearing Board, the respondent admitted that the accounting statement was hypothetical, and did not reflect the transfer of trust funds to TMV. The accounting statement assumed that those funds and the York Street note payments, as received, were placed in a bank account. Further, disbursements made on behalf of Charles were entered, totaled, and subtracted from hypothetical gross receipts, leaving a calculated trust balance on September 1, 1982, of $5,580. The respondent described this accounting statement as a preliminary effort to account for the trust funds. No prior trust accounting of any nature had been rendered by respondent to Charles.

In November of 1982, the respondent refined his preliminary accounting statement by calculating and crediting as receipts the interest which presumably would have been earned had the trust funds been deposited in an interest-bearing account. He also reconstructed additional disbursements based on memory and notes which he had made during the years in question. The disbursements included payments to Smith, Charles, Charles's daughters, and other miscellaneous payments made on behalf of Charles. The respondent testified that somewhere there were records and cancelled checks to support the disbursements, but he was not able to produce them at the hearing. As a result of the second attempt at preparing an accounting, the respondent came up with a calculated trust balance as of October 30, 1982, of $2,041.

In March 1983, Charles died, and Smith was appointed to act as personal representative. In the course of marshalling the estate assets and examining the decedent's records, the attorneys for the personal representative found the trust agreement, the closing documents for the real estate sales, and the hypothetical accounting rendered by respondent to Charles. No cancelled checks or receipts to support the disbursements made by the respondent were found or produced. No written evidence of ownership or investment interest in TMV, such as stock certificates, a promissory note, or venture agreement, was found. After negotiations with the respondent, the personal representative accepted respondent's proposal to settle all disputed claims for $1,250. This payment was received by the estate in April 1984, and the parties mutu-

ally waived any further or additional claims they might otherwise have against each other.

During the course of the hearings, two expert witnesses in the field of trust administration testified for the People. In the opinion of both, respondent's administration of the trust was unprofessional in the following particulars: the trust funds were not segregated; no separate financial and tax records were maintained for the trust; no underlying documents or supporting data were kept; no periodic trust accountings were rendered by the trustee; and no evidence of trust investments was found. Both experts also questioned the propriety of investing the trust res in a coal mining venture.

The Hearing Board found the respondent guilty of professional misconduct in administering the Charles trust in several respects. By investing the initial trust funds in a venture in which he was deeply involved, financially and professionally, respondent allowed his personal interests to affect the exercise of his professional judgment on behalf of his client in violation of DR 5–101(A). By commingling trust funds with his own, the respondent failed to preserve the separate identity of his client's funds. Further, he ignored his professional duty to maintain complete records of his client's funds and to render appropriate accounts to his client regarding them. The Board concluded that these acts and omissions violated DR 9–102(A) and DR 9–102(B)(3) and that they adversely reflect on respondent's fitness to practice law, DR 1–102(A)(6), and violate accepted ethical standards of the legal profession. C.R.C.P. 241.6; DR 1–102(A)(1).

The Board found insufficient evidence to support a finding that the respondent engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation. Accordingly, it dismissed the charge that he did so in violation of DR 1–102(A)(4).

The Hearing Board, while recognizing that respondent had never charged any legal fees to Charles and that a settlement was entered into with the personal representative, recommended that the respondent be suspended from the practice of law for two years. This recommendation was based, in part, on the fact that the respondent had been publicly censured by this court in 1981. *People v. Wright,* 638 P.2d 251 (Colo.1981). A Hearing Panel of the Supreme Court's Grievance Committee approved the findings and recommendation of the Board. We accept the recommendation.

■ A license to practice law assures the public that the lawyer who holds the license will perform in accordance with the highest standards of professional conduct. Failure to live up to that standard warrants discipline.

■ Accordingly, it is ordered that respondent, Paul T. Wright, be suspended for two years from the practice of law; that he comply with the provisions of C.R.C.P. 241.21; and that he shall not be reinstated except upon clear and convincing evidence that he is fit to practice law and has complied with C.R.C.P. 241.22. In addition, the respondent shall pay the costs of $2,434.44 incurred in the disciplinary proceedings to the Supreme Court Grievance Committee, 190 East 9th Avenue, Suite 440, Denver, Colorado 80203, within sixty days from the date of this opinion.